ANGELA M. ALIOTO (SBN 130328)
STEVEN L. ROBINSON (SBN 116146)
ANGELA MIA VERONESE (SBN 269942)
**LAW OFFICES OF JOSEPH L. ALIOTO
AND ANGELA ALIOTO**
700 Montgomery Street
San Francisco, CA  94111-2104
Telephone: (415) 434-8700
Facsimile: (415) 438-4638

Attorneys for Plaintiff,
PSYNERGY ENTERPRISE DEVELOPMENTS, LLC

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PSYNERGY ENTERPRISE DEVELOPMENTS, LLC<br><br>                    Plaintiff,<br><br>vs.<br><br>NOËMIE ZELLER, individually and in her capacity as a principal member and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L.; GIAMPAOLO "WOODY" GUBBIOTTI, individually and in his capacity as a principal member and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L.; PAOLO CAPECCI, individually and in his capacity as a principal member and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L.; SUSANNE GURSCHLER CAPECCI, individually and in her capacity as a principal member and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L.; SOCIETA AGRICOLA I.A.T.C. S.R.L., an Italian Limited Liability Company; CAPECCI ARABIAN TRAINING CENTER; and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER, a principal, member, and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L.,<br><br>                    Defendants. | **CASE NO.**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>**1. FRAUD & DECEIT;**<br>**2. BREACH OF WRITTEN CONTRACT;**<br>**3. NEGLIGENCE; and**<br>**4. CONVERSION**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff, PSYNERGY ENTERPRISE DEVELOPMENTS, LLC, alleges as follows:

**PARTIES, JURISDICTION / VENUE**

1.    During the relevant times herein mentioned, Plaintiff, PSYNERGY ENTERPRISE DEVELOPMENTS, LLC (hereinafter referred to as either "PSYNERGY" and/or "Plaintiff") was and is a California Limited Liability Company in the State of California, United States of America, and the legal registered owner of Atticus (hereinafter referred to as "Atticus"), a purebred Arabian stallion.

2.    Defendant NOËMIE ZELLER (hereinafter referred to as "NOËMIE ZELLER"), is individual and a principal member, manager, operator, collaborator, agent, caregiver, trainer, breeder, handler, broker, and partner, of SOCIETA AGRICOLA I.A.T.C. S.R.L., and is domiciled in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria.

3.    Defendant GIAMPAOLO "WOODY" GUBBIOTTI (hereinafter referred to as "GIAMPAOLO "WOODY" GUBBIOTTI"), is individual and a principal member, manager, operator, collaborator, agent, caregiver, trainer, breeder, handler, broker, and partner, of SOCIETA AGRICOLA I.A.T.C. S.R.L., and is domiciled in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria.

4.    Defendant PAOLO CAPECCI (hereinafter referred to as "PAOLO CAPECCI"), is individual and a principal member, owner, manager, operator, collaborator, agent, caregiver, trainer, breeder, handler, broker, and partner, of SOCIETA AGRICOLA I.A.T.C. S.R.L., and is domiciled in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria.

5.    Defendant SUSANNE GURSCHLER CAPECCI (hereinafter referred to as "SUSANNE GURSCHLER CAPECCI"), is individual and a principal member, owner, manager, operator, collaborator, agent, caregiver, trainer, breeder, handler, broker, and partner, of SOCIETA AGRICOLA I.A.T.C. S.R.L., and is domiciled in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria.

6.    Defendant SOCIETA AGRICOLA I.A.T.C. S.R.L. (hereinafter referred to as "SOCIETA"), an Italian Limited Liability Company (societa a responsabilita limitata or "S.R.L"), located in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria engaged in the business of equine reproductive breeding, genetic distribution, training, and showing Arabian horses in Italy and internationally.    SOCIETA does business throughout the United States of America (e.g., Santa Ynez, California; San Diego, California; Scottsdale, Arizona; Tulsa, Oklahoma, etc.).    Plaintiff is informed and believes that SOCIETA is the parent company or alter ego of Capecci Arabian Training Center, which like SOCIETA is owned and managed by Defendant PAOLO CAPECCI.

7.    Defendant CAPECCI ARABIAN TRAINING CENTER (hereinafter referred to as "CAPECCI ARABIAN TRAINING CENTER") located in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria engaged in the business of equine reproductive breeding, genetic distribution, training, and showing Arabian horses in Italy and internationally.    CAPECCI ARABIAN TRAINING CENTER regularly does business throughout the United States of America (e.g., Santa Ynez, California; San Diego, California; Scottsdale, Arizona; Tulsa, Oklahoma, etc.).    Plaintiff is informed and believes that CAPECCI ARABIAN TRAINING CENTER is owned and managed by Defendant PAOLO CAPECCI. There is effectively no separation of identity between SOCIETA and CAPECCI ARABIAN TRAINING CENTER. The unity of interest, purpose, and ownership between SOCIETA and CAPECCI ARABIAN TRAINING CENTER is such that their separate identities and personalities do not exist.  Assets belonging to SOCIETA and CAPECCI ARABIAN TRAINING CENTER are comingled; Defendant PAOLO CAPECCI makes all decisions for and about SOCIETA and CAPECCI ARABIAN TRAINING CENTER functions as a mere instrumentality of PAOLO CAPECCI's through which he performs business and other operations, including by having SOCIETA and CAPECCI ARABIAN TRAINING CENTER enter into business contracts such as the agreements hereinafter alleged.  Accordingly, PAOLO CAPECCI personally benefits from SOCIETA and CAPECCI ARABIAN TRAINING CENTER's business transactions, and

SOCIETA and CAPECCI ARABIAN TRAINING CENTER incurs liabilities that would otherwise be personal to PAOLO CAPECCI, allowing him to avoid personal liability and protect personal assets while still reaping personal benefits. Accordingly, SOCIETA and CAPECCI ARABIAN TRAINING CENTER must be bound to any judgment against PAOLO CAPECCI, and vice-versa. If the privilege of separate existence is recognized and the acts of SOCIETA and CAPECCI ARABIAN TRAINING CENTER are treated as those of the entities alone, an inequitable result will follow.

8.     Defendant CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER (hereinafter referred to as "CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER") located in or around Umbertide, Italy, a municipality in the province of Perugia, in the Italian region of Umbria engaged in the business of equine reproductive breeding, genetic distribution, training, and showing Arabian horses in Italy and internationally. CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER does business throughout the United States of America (e.g., Santa Ynez, California; San Diego, California; Scottsdale, Arizona; Tulsa, Oklahoma, etc.). Plaintiff is informed and believes that CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER is owned and managed by Defendant PAOLO CAPECCI. There is effectively no separation of identity between SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER. The unity of interest, purpose, and ownership between SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER is such that their separate identities and personalities do not exist. Assets belonging to SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER are comingled; Defendant PAOLO CAPECCI makes all decisions for and about SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER functions as a mere instrumentality of PAOLO CAPECCI's through which he performs business and other operations, including by having SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER enter into business contracts such as the agreements hereinafter alleged. Accordingly, PAOLO CAPECCI personally benefits from SOCIETA and CA' DI GIANNI

INTERNATIONAL ARABIAN TRAINING CENTER's business transactions, and SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER incurs liabilities that would otherwise be personal to PAOLO CAPECCI, allowing him to avoid personal liability and protect personal assets while still reaping personal benefits.  Accordingly, SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER must be bound to any judgment against PAOLO CAPECCI, and vice-versa.  If the privilege of separate existence is recognized and the acts of SOCIETA and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER are treated as those of the entities alone, an inequitable result will follow.

9.     At all times mentioned in the causes of action into which this paragraph is incorporated by reference, each Defendant was the agent or employee of SOCIETA.  In doing the things alleged in the causes of action into which this paragraph is incorporated by reference, each Defendant was acting within the course and scope of the agency or employment and was acting with the consent, permission, and authorization of SOCIETA.  All actions of each Defendant alleged in the causes of action into which this paragraph is incorporated by reference were ratified and approved by the officers or managing agents of SOCIETA.

10.     In doing the things hereinafter alleged, the individual Defendants, whether named or unnamed, were acting in concert with and under the direction, or with the express or implied ratification, of their superiors, supervisors and employer and the named Defendants.  Plaintiff is informed and believes and thereon alleges that the conduct of the individually named and unnamed Defendants was known to the other Defendants and such conduct was expressly or impliedly condoned and ratified by the named Defendants.  Plaintiff is further informed and believes that the named Defendants failed to criticize, censure, terminate, suspend, or otherwise take any action against the unnamed Defendants once informed of their conduct.

## JURISDICTION

11.     The District Court is an appropriate forum for purposes of diversity pursuant to 28 USC § 1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of California and subjects of a foreign state. The Northern

District of California is the appropriate venue as Plaintiff PSYNERGY is located in Alameda, California, and its designated representative is located in San Francisco, California; and on or about June 3, 2023, in addition to several emails exchanged the parties, Defendant SUSANNE GURSCHLER CAPECCI, owner, legal representative and a principal member, and manager of SOCIETA further memorialized their respective understanding and responsibilities concerning Atticus by executing an Agreement in San Francisco, California.  SUSANNE GURSCHLER CAPECCI agreed that jurisdiction and venue for enforcement of this Agreement would lie in San Francisco, California, pursuant to the Civil Code of California.

12.     The District Court has supplemental jurisdiction to interpret the California state law that controls the Agreement on which the rights of the parties hereto are dependent.

13.     No claim filing prerequisite or other administrative remedy need be exhausted to establish jurisdiction in this matter.

14.     Venue in this Court is proper because the unlawful practices and civil injuries and claims alleged herein occurred and were also breached within the State of California.

## FACTUAL GENERAL ALLEGATIONS

15.     Managing Partner of PSYNERGY, Michael Weinstein, along with his father Herb Weinstein and sister Lissa Weinstein, for the past fifty years, are well respected world-wide as celebrated formidable leaders, breeders, and knowledgeable aficionados of the Arabian horse, having owned and bred Arabian horses imported from all over the world.

16.     Atticus, was born **June 19, 2015** and a recipient of numerous championships and awards in North America and Canada.  He was bred by PSYNERGY in the tradition of the Weinstein family.  PSYNERGY continues to lead the way in breeding beautiful show and equestrian Arabian horses, domestically and internationally.  But Atticus was very special, a superstar standout that was very personally attached to all of the managing members of PSYNERGY INC., and the public.

17.     On or about **January 6, 2023**, NOËMIE ZELLER and PSYNERGY through Michael Weinstein, entered into a written partnership agreement memorialized via emails.  The exchange of emails, which memorialize all required legal components, are binding and enforceable.  Specifically,

PSYNERGY, owner of Atticus, agreed to transport Atticus via an aircraft to Italy at their expense, with the ultimate destination at the Capecci Arabian Training Center in Montone, Umbria, Italy, for breeding and stud services (e.g., theriogenology / reproductive services using fresh or frozen-thawed semen) so that Atticus could pass his progeny and legacy to the next generation.  This service would be available to breeders in Europe and other countries who wanted to breed mares to Atticus to add his bloodlines to their programs.  NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, and PAOLO CAPECCI, international Arabian horse breeders by profession and reputation, while in custody and control of Atticus, agreed to provide boarding, lodging, shelter, protection, water for hydration, drink, feed, hay, all basic veterinary care, therapy, exercise, conditioning, bathing, farrier (hoof care and shoeing), manage, and to ensure the safety and wellbeing of Atticus during his stay for approximately 18 months. NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, and PAOLO CAPECCI, further agreed, as specialists and experts, to collect, preserve, freeze, short-term and long-term storage of equine semen, to ship around the world.  NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, and PAOLO CAPECCI, also agreed to evaluate Atticus' semen for sperm count and motility; to find buyers; and to register foals born in Europe and the Middle East.  Given the Italian equine laws (Capo Ufficio Segreteria A.N.I.C.A. [Associazione Nazionale Italiana Cavallo Arabo] – Head of ANICA's Registry Office), NOËMIE ZELLER and her partners were allowed recorded temporary transfer (leasing) of Atticus, via a declaration form [Notice of Export and Export Certificate request], for the limited purpose of transacting business within Italy.  NOËMIE ZELLER and PSYNERGY agreed that all income and revenue would be shared and split equally 50 /50 between the two parties. **To date, this has not occurred.** NOËMIE ZELLER agreed to provide PSYNERGY with monthly accounting and regular payments for income received. To date, this has not occurred. The stud fee for year 2023 was 2,000 Euros; and the stud fee for year 2024 would be later discussed and agreed to after the 2023 breeding season. That discussion never happened.

18.     On or about **March 9, 2023**, Atticus departed his home base in the State of Arizona enroute to Los Angeles (LAX), CA; then to Holland, Amsterdam (Netherlands); then to Liege, Belgium, where he was quarantined for a number of days; then to his ultimate destination in Italy.

1  Throughout this journey, Atticus was in excellent condition and had been cleared by veterinarians as
2  fit to travel.

3        19.    On or about **March 22, 2023**, NOËMIE ZELLER sent a message to Michael
4  Weinstein stating—He will go to the main barn in 3 to 4 days and we will start to collect him. "I send
5  to you the x-rays taken of Atticus and the vet report on his arrival."

6        20.    On or about **March 30, 2023**, Atticus' passport stated that he received the Equilis
7  Prequenza Te, given by DVM Andrea Del Sero.  That injection is for Influenza and Tetanus, it is
8  NOT for Rhino or Herpes (EHV1-4).  Consequently, Atticus was NOT vaccinated for Rhino or
9  Herpes.

10       21.    On or about **March 31,2023**, Atticus moved from the quarantine barn at Capecci to
11 the main training barn.  He was in excellent condition at that time.

12       22.    On or about **June 3, 2023**, SUSANNE GURSCHLER CAPECCI, legal representative
13 and a principal member, and manager of SOCIETA AGRICOLA I.A.T.C. S.R.L., and Michael
14 Weinstein, partner, and designated representative for PSYNERGY, further memorialized their
15 respective understanding and responsibilities concerning Atticus by executing, in San Francisco,
16 California, an Agreement for Services provided by Societa' Agricola I.A.T.C. S.R.L.  SUSANNE
17 GURSCHLER CAPECCI further indicated and agreed ". . . to preserve the good health of the animal
18 by providing daily rations of food, . . as well as the owner and a veterinarian."  That it ". . . undertakes
19 to cover all ordinary expenses of services provided during the stay of the horse (including but not
20 limited to breeding, feeding, farrier (sic) etc.), as well as extraordinary expenses. . ."  Moreover,
21 SUSANNE GURSCHLER CAPECCI added, "However, as reassurance, the Company guarantees
22 that their employees are responsible and capable persons, fit for handing and working with horses."
23 Finally, SUSANNE GURSCHLER CAPECCI agreed that jurisdiction and venue for enforcement of
24 this Agreement would lie in San Francisco, California, pursuant to the Civil Code of California.

25       23.    On or about **August 08, 2023**, Veterinarian Andrea Del Sero issued a Veterinary
26 Certificate of Examination certifying to Markel Insurance Company that he carefully examined and
27 observed Atticus and found that Atticus was healthy and sound for insurance purposes.

28

24.    On or about **August 27, 2023**, Michael Weinstein asked NOËMIE ZELLER for an update how Atticus was doing.  NOËMIE ZELLER replied that she asked SUSANNE GURSCHLER CAPECCI and SUSANNE GURSCHLER CAPECCI reported that Atticus is gaining some weight and doing very well.

25.    On or about **October 29, 2023**, once again Atticus was given an injection. Atticus' passport states that he received the Equilis Prequenza Te, give by DVM Andrea Del Sero. That injection is for Influenza and Tetanus, it is NOT for Rhino or Herpes (EHV1-4). Consequently, Atticus was NOT vaccinated for Rhino or Herpes.

26.    On or about **January 16, 2024**, NOËMIE ZELLER provided Michael Weinstein a final accounting of revenue for Atticus wherein, among other items, NOËMIE ZELLER reported that Atticus brought in a total of 32,000 Euros.  NOËMIE ZELLER added that the total amount to be transferred to Michael Weinstein was 19,375 Euros and thanked him for entrusting Atticus with her in Europe.  At this time today, February 2025, Michael Weinstein does not have a full accounting of all of Atticus' breedings, nor has he ever received any funds.

27.    On or about **February 06, 2024**, Michael Weinstein inquired again for an accounting from NOËMIE ZELLER.  At this time, he discussed bringing Atticus home to Scottsdale, Arizona.

28.    **March 28, 2024,** once again Atticus was given an injection. Atticus' **passport** states that he received the Equilis Prequenza Te, given by DVM Andrea Del Sero. That injection is for Influenza and Tetanus, it is NOT for Rhino or Herpes (EHV1-4). Consequently, Atticus was NOT vaccinated for Rhino or Herpes.

29.    From the date of Atticus' arrival at Capecci Training Center in March of 2023 to the date that he arrived at the clinic in Belgium, August 19th, 2024, Atticus was never given the vaccine for EHV 1-4, the herpes Rhino Vaccine.   Upon arrival at the clinic Bosdreef, Dr. Katleen Vanschandeviji, stated that Atticus was "admitted with fever, small amounts of nasal discharge and a nasal swab (21/08) returning positive for EHV-1 and EHV-2. Today he is waking stiff in the hind."

30.    On or about **April 6, 2024**, Michael Weinstein inquired of NOËMIE ZELLER that if Atticus was still breeding his stay could be extended another thirty (30) days because Atticus would

be required to first quarantine in California for thirty (30) days prior to his return to Arizona in early August 2024. NOËMIE ZELLER replied two months later, on or about June 5, 2024, that it could be discussed "what is best for him [Michael Weinstein] and Atticus."

31.    On or about **June 16, 2024**, Michael Weinstein, Jean Edwards, another managing partner of PSYNGERY and Sandro Pinha, Atticus' trainer, visited Atticus at the Capecci training center. They all observed that Atticus was thin, his tail rubbed out, that he had no hind shoes, that his hind feet were in poor condition, and front feet and shoes were long, overdue for new shoes. These major changes to Atticus were shocking to Michael, Jean, and Sandro Pinha. Michael knew something was very wrong. Atticus was not being properly cared for, his condition was weak, very unlike Atticus, who had always been very strong muscular stallion.

32.    On or about **July 18, 2024**, while at the training center in Italy, reports by NOËMIE ZELLER indicated that Atticus had several upper respiratory infections and a dark green discharge from his nostrils. This statement is supported by photos and video taken by a friend of Michael's who visited the training center and took photos of Atticus. NOËMIE ZELLER later denied she ever said that Atticus had several upper respiratory infections. Accordingly, Atticus was unfit for travel and should not have been shipped with this issue.

33.    On or about **July 30, 2024**, NOËMIE ZELLER inquired of Michael Weinstein if he already had a date when Atticus would be leaving the farm in Italy so that she could prepare the necessary health and travel papers and complete any pending breeding. To date Michael Weinstein does not know what those breedings were or if they resulted in a pregnant mare. It is a very important in the Arabian Horse world, to know each and every breeding, whether that breeding resulted in a foal and whether that foal went on to win championships. That is the very nature of the business. Currently, PSYNERGY is in the dark as to exactly how many 2023 breedings and what was the result of the 2024 breedings. This denial of essential information and lack of transparency is unacceptable in this business.

34. On or about **August 4, 2024**, Michael Weinstein notified NOËMIE ZELLER that he was getting Atticus ready to return home to Arizona via Belgium, so that he would be close to the airport.  In Belgium, Atticus would be hosted at a friends stable.

35. On or about **August 7, 2024**, Michael Weinstein informed NOËMIE ZELLER that he had secured a trailer for Atticus in the coming week, and that she should make sure that Atticus had his medical information and vaccinations ready to go.  **NOËMIE ZELLER replied in an email that all vaccines are in his Passport as it is obligatory in Europe**.  Though there was no vaccine for EHV (Rhino/Herpes virus) as NOËMIE ZELLER stated in an email, the Passport only reflects that Atticus was given Equillis Prequenza-TE (flu and tetanus), on three separate occasions, while in Montone, Italy, and while in the care of the Capecci Training Center.  At no time have any of the above individuals provided medical records indicating otherwise.

36. On or about **August 16, 2024**, at approximately 4:22 a.m., Atticus, in ill health, due to previous evidence of a nasal discharge, and failure to have been given the Rhino vaccine, began a three (3) day leg ground journey transport via a large truck (Mercedes Actros with misting cooling system) from Montone, Italy, to his ultimate destination in Lommel, Belgium.  For the duration of this trip, Atticus had a full-size box to himself and was not tied during transport, so he had freedom to lower his head throughout the trip.  The driver / operator of the truck, per EU Commission Regulation (EC) NO. 561/2006, shall comply as follows: daily driving period shall not exceed 9 hours, daily rest period shall be at least 11 hours, breaks of at least 45 minutes should be taken after 4 ½ hours at the latest, etc.  The three (3) day journey was planned and prearranged.  All of this is contrary to what NOËMIE ZELLER put in an email dated **September 12, 2024 at 7:50 AM**.  In an effort to improve her weakened position of being neglectful, NOËMIE ZELLER stated, "I also like to inform you that Atticus ENB has been taken from IATC Italy on the 15th of August on 4AM in the morning and he arrived  on the 19th of August in the morning.  This mean's (sic) 4 ½ days travel for him!"  NOËMIE ZELLER further added that the travel conditions (e.g., hot, etc.) were not ideal for this journey.  The true travel time was three and a half days with long hours of rest in between.  According to the transport log journal, the following actually occurred:

**LEG I – Montone to Gallarate, France**

On or about **August 16, 2024**, at approximately 4:22 a.m., Atticus was loaded onto the truck in Montone, Italy, at the Capecci Arabians Center, and arrived in Gallarate, France, for a lay-over at 16:00 hours, (4:00 p.m.) on August 16, 2024.

**LEG II – Gallarate, France to Kruisem, Belgium**

On or about **August 17, 2024**, at approximately 1:46 a.m., after 9 hours 46 minutes of rest, he was reloaded on the van and was transported to the hauler's personal stables in Kruisem, Belgium. At 17:40, Atticus arrived at the hauler's stables.

**LEG III – Kruisem, Belgium to Lommel, Belgium**

On or about **August 19, 2024**, at approximately 6:30 a.m., Atticus was rested at the hauler's personal farm for 35 hours, 50 minutes. He was once again loaded onto the van and arrived 1 hour and 25 minutes later to Lommel, Belgium. He arrived at 7:55 a.m. on August 19, 2024. Michael's friend in Belgium then immediately observed that Atticus was experiencing respiratory distress. Atticus was started on Gastroguard (safe and effective treatment for gastric ulcers which suppresses acid secretion and allows ulcers to heal or improve) for suspected ulcers and it was further observed that Atticus developed a fever.

37. The European Union (EU) Commission via the "TRACES" online platform mandates consignments of animals to be accompanied by official certificates, attesting compliance with the applicable requirements. Had a veterinarian examined Atticus before departing Capecci Training Center to determine he was unfit for travel; the veterinarian would never have issued a certificate for him to travel. **It was further later discovered that prior to being transported, NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, and PAOLO CAPECCI did not have Atticus vaccinated with the proper EHV immunizations as is customary for best practices on breeding farms. Michael Weinstein was provided with medicals records, after the fact, that established that Atticus was not vaccinated for EHV as well as other core vaccines. The TRACES certification was not complied with, as is evidenced by the TRACES paperwork lacking a wet or digital signature**.

38.     On or about **August 20, 2024**, Michael Weinstein was advised by Cindy Reich [second-generation horsewoman with over 40 years' experience in equine breeding and equine management and consulting], that Atticus was sick and may need to be admitted to the clinic.

39.     On or about **August 20, 2024**, Atticus became stiff in the hind legs, holding his tail to one side.  Again, review of his Passport indicated no evidence of vaccination for EHV.  Atticus was tested by a veterinarian for EHV and Atticus tested positive for EHV-1 and EHV-2.  There is a neurological form of EHV that is very serious, which would explain the stiff legs and the tilted tail.  EHV is also very contagious, so the veterinarian recommended Atticus be transferred to a specialty equine hospital with quarantine facilities for further care, diagnostics, and treatment.  Thus, Atticus was referred to the Dierenkliniek De Bosdreef Equine Clinic in Ghent, Belgium.

40.     On or about **August 21, 2024**, Atticus was transferred and admitted at the Clinic BOSDREEF.  Despite treatment, Atticus' fever returned, a deep nose swab was taken to test for EHV (Equine Herpesvirus).  The deep nose swab results tested positive for EHV-2 (8/23, Bosdreef).  Michael Weinstein noted that in reviewing Atticus' Passport, it appeared that he was never vaccinated for EHV, as was mandatory as evidenced by the passport report above dated March 28th, 2023, to October 29th, 2023, to March of 2024.

41.     Atticus was started on antibiotics and on antiviral for equine herpesvirus, bloodwork was also taken to determine if he had any diseases specific to Italy.  A gastric ultrasound was performed to rule out gastric issues. That showed that Atticus was not producing much manure. They wanted to perform another nasal/trachea swab to see how the Rhino/Herpes virus was progressing.  It was further learned that Atticus was grinding his teeth and as a consequence, he was started on ulcer medications.

42.     On or about **August 24, 2024**, Atticus appeared depressed, and had a fever.  Ultrasound results show fluid in the lungs, severe pneumonia / pleuropneumonia.  Drains were put in both sides of pleural cavity to drain fluid.  Samples were taken from each side to send for culture.  After placing drains, Atticus was breathing better and more comfortable.  Endoscopic exam showed mucus in trachea, a sample was taken to be cultured to determine what antibiotic to treat with.

Gastroscopy showed gastric ulcers to level of margo plicatus and squamous section of stomach. Omeprazole and sucralfate treatment started. Paraffin oil administered via nasogastric tube as Atticus was not eating well.

43.    On or about **August 25, 2024**, Atticus was more alert than the previous day; however still draining fluid from chest tubes, and still in a life-threatening condition.

44.    On or about **August 26, 2024**, Atticus' attitude and eating improved and he was breathing more comfortably. Oxygen saturation improved to 83% from 72%, and had better observed respiratory rate. Swab for EHV 1 in their lab was negative, but another swab sent out to lab for more precise testing. Light fever in morning, treated and no fever in evening. They considered taking him off fluids - fluid draining from tubes cleaner. Scan of lungs scheduled.

45.    On or about **August 27, 2024**, no fever, fluid in lungs decreased, daily blood gas results stable, no IV fluids needed, Creatinine and albumin levels within normal limits. Found fluid in pleural cavity, treatment started next day with Actilyse (human drug for thrombosis) to break up the fibrin strands forming. The honeycomb areas are interspersed with fluid collections, consistent with pleural effusion. Lab results showed *E. coli* and *Streptococcus Equizooepidemicus* are sensitive to the antibiotics currently receiving. Attitude much improved and eating well.

46.    On or about **August 28, 2024**, Actilyse treatment started, drains will remain closed for the treatment so it can work effectively, drains will be opened next day. Flush on right side had fluid that was more turbid and will be monitored closely.

47.    On or about **August 29, 2024**, another treatment of lytic drug and flushed drains, a lot of fibrin present, necrotic tissue, and fluid in the drain, so drug is doing its job. Atticus had more pain as treatment is uncomfortable on body, so they are giving him pain control medications more frequently. Repeat treatment again on August 30th and August 31, 2024, so they will be monitoring him carefully. Atticus did not spike a fever from the treatment. Another swab for EHV was done to see if still negative and if not shedding, will remove the biosecurity protocols.

48.     On or about **September 1, 2024**, Michael's friend visited the clinic and took some video in the stall.  Observed left lung draining red fluid which is normal for the lytic treatment, right lung is draining more infected liquid, and Atticus was having heavy breathing at times.

49.     On or about **September 2, 2024**, Atticus continued to remain stable.  Ultrasound showed slight improvement of pneumonia, but it was still very extensive.  They continued to flush lungs.  Swab results for EHV were negative so they can relax biosecurity measures.

50.     On or about **September 3, 2024**, Michael Weinstein advised NOËMIE ZELLER that Atticus remains in serious condition in a clinic; and he was requesting all of his medical records and the name and contact information of his treating veterinarian to learn what treatment, if any, he received during his time in Italy.  **NOËMIE ZELLER replied to Michael Weinstein that Atticus' Passport did not conform with EU regulations.  Moreover, NOËMIE ZELLER added, ". . . <u>but as much as I know we treated him only in the beginning when he arrived from the US</u> after he did always very well in Italy. . ."** (emphasis added)

51.     On or about **September 4, 2024**, NOËMIE ZELLER communicated with Mirjam Boschini with A.N.I.C.A. concerning the Export Certificate for Atticus from Italy to Belgium. Atticus in the meantime was suffering, his left drain was removed as the fluid was clear and not much drainage, will follow up with ultrasound to see if left lung is stable.  Right drain will stay as it needs to still be flushed regularly.  Breathing was rougher so endoscopic exam performed and took another swab to make sure the antibiotics they are using are still appropriate.

52.     On or about **September 6, 2024**, Michael Weinstein alerted NOËMIE ZELLER that he was still waiting for all veterinary records and the attending veterinary contact information.  Upper respiratory noise heard on September 4th is not present now.  Based on the culture results, antibiotics changed.  Drainage from right lung is improved and will be removing that drain.  Lung ultrasound to be repeated on September 9th and monitor the pneumonia to see if continues to improve or whether it begins accumulating fluid again.

53.     On or about **September 9, 2024**, Atticus is more comfortable now that the drains are removed, as he can move around stall and lie down.  The ultrasound shows the lungs are improving.

The fluid they could not reach with the flushing is starting to consolidate into abscess and they are monitoring to determine the right time to go in and open these abscesses. This is occurring on both sides, and they hope to do each side separately and not at the same time, but cannot tell at this time. No fever and appetite good.

54.      On or about **September 13, 2024**, Atticus is starting to accumulate fluid in the right lung again and they are going to have to put a drain back in that side.

55.      On or about **September 19, 2024**, **first thoracotomy** (cutting into his chest to remove the necrotic [dead] tissue from the abscesses) **was performed on the right side to save the horse, but obvious risks involved, with laminitis being biggest fear.** "Laminitis" is indeed a risk factor, since he is so sick and standing for a long amount of time. **Atticus is in pain from the surgery and less comfortable when walking. Pain medicine increased and put Soft Ride boots on front feet.**

56.      On or about **September 20, 2024**, Atticus still in pain. Pain more evident when walking. Doctors believe it is from chest pain. He has some increased pulse in front feet, a sign of laminitis. Flushed surgical site, removed more dead tissue. Flushing will continue over the weekend.

57.      On or about **September 21, 2024**, while hospitalized at the Dierenkliniek De Bosdreef Equine Clinic, a worldclass equine hospital with world-renowned certified specialists, diagnosticians, orthopaedists, and surgeons, in complex equine treatments and medical imaging, for pleuropneumonia (bilateral), performed a thoracotomy on the right side of the thorax, which was successfully carried out. However, it was noticed that Atticus was walking more comfortably, so the stiffness in walking the prior day, was due to the pain from the procedure.

58.      On or about **September 22, 2024**, Atticus walking better and smoother. Flushed incision – determining when to do second thoracotomy.

59.      On or about **September 23, 2024**, flushing went well - removing a lot of dead tissue. Second thoracotomy planned for next day. Michael Weinstein and his team questioned doing the second thoracotomy so soon, given his condition and the continued risk of laminitis. The hospital replied it cannot wait because of the abscesses forming.

60.     On or about **September 24, 2024**, DVM Katherine Bafort – internal medicine and anesthesiologist and DVM Katleen Vanschandevijl – Dipl. ECEIM European Specialist Equine Internal Medicine replied, "I completely understand your concerns and it is ours as well.  It's always a balance to take the decision when to proceed, but in this case there will not be an ideal moment.  At this stage we have the presence of pus inside the thorax that can be the cause of laminitis and of the catabolic state of the body.  As long as this stays inside, it cannot get better.  The procedure itself is not a possible cause of laminitis, the chronic infection and pus is.  His appetite is really good and is having a diet concentrated in fat and protein. But he will not gain weight as long as there is an abscess present."

61.     On or about **September 25, 2024**, Atticus was stable but did not want to lie down, which means he was not getting as complete a rest as he should.  Potential laminitis changes in his right front foot were being monitoring closely.

62.     On or about **September 27 2024**, Michael Weinstein informed NOËMIE ZELLER that Atticus remains in the clinic but appears to be improving.  That he expected a report soon that establishes that Atticus arrived with a very serious case of ulcers which he had for months.  That he was never vaccinated and developed an infection before he departed.  That he was very disappointed with his condition but had no idea that he was not getting the basic medical care.  That he was having a very hard time understanding why Atticus was not being treated.  On said date, NOËMIE ZELLER replied by disputing Michael Weinstein's accusations and that the resident vet did check him before his departure and he was looking very healthy and in good condition as written in the vet report.  On said date, thorax flushed, amount of fluid draining reduced a lot, is walking better, appetite is really good.

63.     On or about **September 30, 2024**, thorax examined with endoscope, right side doing well, left side had only 2 areas of concern.  Ultrasound of thorax on right side very good, with normal ventilation.  Clinical signs of laminitis really stable, walking better and better, digital pulsation gone.  New radiographs will be taken this week.  Still good appetite and gaining weight.

64.     On or about **October 2, 2024**, Atticus continues to remain stable.  Starting to reduce pain medication.

65.     On or about **October 3, 2024**, no increased changes in feet and no flushing to give Atticus a rest.  Cleaning and endoscopic exam tomorrow.

66.     On or about **October 4, 2024**, flush and endoscopy went well - normal healing on both sides.  Started painkillers again.

67.     On or about **October 6, 2024**, Michael Weinstein's friend took video of Atticus.

68.     On or about **October 8, 2024**, Atticus feels better, behaves at ease in his box.

69.     On or about **October 10, 2024**, Veterinarian Katleen Vanschandevijl informed Cindy Reich in a writing the following:

> **1.     Atticus did not receive the minimum standard of care for best practices while in Italy.**
>
> **2.     Atticus was not vaccinated for EHV, which is standard practice for horses in breeding/show farms where there is changing population of horses traveling to and from the farm.**
>
> **3.     The ulcers that Atticus had upon arrival in Belgium were extensive and well established.  It took significant time to develop that level of ulceration. The ulcerations began in Italy.**
>
> **4.     The significant weight loss and loss of muscle mass and his overall poor condition contributed to his lack of body resources to fight the infection acquired while in Italy.**
>
> **5.     He tested antibody positive for EHV-4 (even though swabs tested positive for EHV-1 (rhino), he did not have antibodies to it, so may have been superficial or transitory.  However, there are documents of positive EHV-1 swabs.  Based on the fact that Atticus had a blood antibody response to the EHV-4 virus, he had to have been exposed to the virus in Italy prior to leaving for Belgium.**
>
> **6.     He had evidence of infection based on photos of July 18, 2024, which regardless of cause would not have resolved prior to shipment to Belgium. Therefore, Atticus should not have been shipped with a known health issue**.

All the above resulted in a perfect cascade of events of: chronic infection, poor body condition, ulcers, exposure to EHV-4.  Moreover, this culminated in a massive pleuropneumonia that Atticus was incapable of fighting effectively.

70.     On or about **October 12, 2024**, radiographs of feet were taken, and there was more sinking of the coffin bone on left front foot.

71.     On or about **October 14, 2024**, DVM Katherine Bafort discussed with colleagues of the orthopedic department Atticus' feet.  For the moment the shoes will stay on - still in Easy Ride boots.  Adapting treatment/pain management to the clinical image, with for the moment is very comfortable.  Suggest taking radiographs again by the end of the week to monitor RF.

72.     On or a about **October 22, 2024**, internationally recognized laminitis expert, Dr. Ric Redden, a farrier (person who shoes horses) and veterinarian, evaluated the X-rays taken of Atticus' feet.  Of the X-rays that were taken in Italy at Capecci's, when Atticus first arrived, he made the following assessment: "The X-rays made March 14, 2023, are within healthy limits and a typical hi/low horse LF very low gr club and the opposite a negative 2 to 3 degrees. He appears well shod with a 3-degree wedge pad very typical approach for negative PA. The images are produced using the low beam standard required for podiatry issues.

73.     On or about **October 22, 2024**, Dr. Ric Redden evaluated the X-rays of Atticus' front feet in Belgium.  **Conclusion: This case started off very high risk for a tremendous laminitis insult to the integrity of the laminae.  It started prior to the September images.  This stallion has bilateral extensive vascular and soft tissue damage, his rear feet remain within normal range.  The history and the fact that he doesn't lie down greatly increases the risk for excessive to catastrophic strategic laminae failure and extensive solar corium compression both basically obliterating the vascular supply routes.  He would be classified as a sinker in the advanced stage of the highest level of laminae insult.  But for the maltreatment of Atticus' feet during the time that he was at Capecci Training center, he would not have been so susceptible to the laminitis that eventually killed him**.

74.     On or about **October 17, 2024**, though there was no evidence of any foot issues for the previous 18 months, the X-rays indicated that Atticus developed and revealed a steady widening of the laminae (consistent with acute laminitis) and the cumulative effects precipitated catastrophic displacement of the left front third phalanx or "coffin bone."  This primary syndrome known to have proceeded to a high-level laminae insult without the aggressive treatment of a prophylaxis assistance in hopes of staying ahead of the ill effects, became detrimental to efforts in saving Atticus.  Cindy

Reich receives phone call in morning from DVM Katleen Vanschandevijl saying the coffin bone had rotated almost completely, only 1 mm from the sole.  Consequently, given the severity and pain and suffering Atticus was experiencing, Atticus was unfortunately euthanized for humane purposes.  It can be ostensibly gleaned from the above factual undisputed allegations that Atticus' demise came about from the rotation of the coffin bones due to laminitis as a result of the combined systemic insult to his body from the pneumonia, and Rhino disease, as well as the toll the treatment took on his emaciated body and from the fact that his care for the last year and a half was totally lacking.

75.     Between late **March 2023 and August 2024**, though Atticus successfully provided numerous breedings for NOËMIE ZELLER's and GIAMPAOLO WOODY GUBBIOTTI's clients which yielded substantial revenue in the thousands of Euros, PYNERGY, has yet to see any share of the profits.  NOËMIE ZELLER admitted to Michael Weinstein that she received payments for the breedings and that all of the breedings sold had been fully paid to her and the Capecci training center.

76.     Between late **March 2023 and October 2024**, NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, PAOLO CAPECCI, and the above agents, abdicated and abandoned their respective responsibilities under the contract and breached their duty of care.  Atticus never received the minimum standard of care while in Italy.  For instance, NOËMIE ZELLER, GIAMPAOLO WOODY GUBBIOTTI, PAOLO CAPECCI, trainers, and handlers, failed to regularly visit Atticus whereby any of them would have noticed obvious and apparent issues by simply examining the stallion.  If any of them had regularly visited Atticus they would have observed that he developed a dentinal bridge [Bridge is a response to pulpitis, or inflammation of the pulp, which can be caused by dental fractures or other insults to the endodontic system].  Causation is typically the result of "cribbing," over-grinding, tooth fracture, or biting the bars of a stall or hard surfaces which creates the abnormal wear on the front of the incisors due to friction from rubbing.  Apexification is used to address pulp necrosis [pulp inside teeth dies, usually due to tooth decay or trauma].  Apexification is indeed seen after pulp necrosis.

77.     According to the main veterinarian treating Atticus in Belgium, Dr. Katleen Vanschandevijl, stated: **Atticus was not regularly seen, treated, or cared by a licensed**

1 **veterinarian; nor was he protected from other horses who were infected with EHV, an endemic**
2 **disease in the EU; Atticus was not vaccinated with the proper EHV immunizations. He was**
3 **very underweight--using the modified Henneken scale, Atticus would be at 2/9.  The incubation**
4 **period for EHV-4 is 2 to 7 days but can be as long as 14 days.  However, the serology [scientific**
5 **study or diagnostic examination of blood serum, especially with regards to the response of the**
6 **immune system to pathogens or introduced substances] did indicate already an immune**
7 **response to EHV-4, so he must have had contact with the virus at least 1 to 2 weeks prior.  The**
8 **ideal protocol is vaccination for influenza and EHV-1 and EHV-4, and in farms where there is**
9 **a mixed population with breeding mares and foals/young horses, also vaccination for rotavirus**
10 **and strangles can be necessary.  Housing the horses in separate groups is also highly**
11 **recommended**.

12       78.    It is commonly known and established that a viral infection acts as a predisposing
13 factor for bacterial infections' there were many signs that the Capecci Training Center should have
14 noticed.  Not to mention the giving of vaccines, air hygiene, hay on the ground, treatment of viral /
15 upper respiratory tract infections.

16       79.    With regards to Atticus being severely underweight and emaciated (BCS "2" score),
17 the Body Condition Score (BCS), easily performed, is used to measure the degree of health and
18 integration of all body areas.  The body condition of horses based on the degree of fat cover is a good
19 indicator of a horse's general health.  The BCS allows one to access if the horse is too thin, too fat, or
20 about right.  Horses are scored on a scale from 1 (poor) to 9 (extremely fat) in six areas where they
21 deposit fat – neck, withers, spinous processes (part of back vertebrae that project upwards) and
22 transverse processes (portion of vertebrae that projects outward), tail head, ribs, and behind the
23 shoulder.  The subjective assessment is based on visual and physical (palpation) of the specified body
24 regions including the hooks (tuber coxae and hip joints) and pins (tuber ischia and lower pelvic bones).
25 Comparisons of relative adiposity can be made within or between horses.  Categorization of body
26 condition as underweight (BCS $\leq 3$, 1–9-point scale), moderate (BCS 4–6), overweight (BCS $\geq 7$) or
27 obese (BCS $\geq 8$) can be used as an aid in the management of body condition for optimal health and
28

performance.  The BCS allows for above classification of horses into underweight, overweight, or obese categories.

80.    Aside from the neglect, nonfeasance, and egregious behavior described above, false and untruthful derogatory statements were made by GIAMPAOLO WOODY GUBBIOTTI  so that third parties would have a bad opinion and judgment about PSYNERGY, and Atticus.  Specifically, at a show recently, GIAMPAOLO WOODY GUBBIOTTI stated that Atticus was brought to Italy, though false and fabricated facts, with an "underbite."  GIAMPAOLO WOODY GUBBIOTTI told that they had to try to grind the teeth of Atticus to make them more even, as "no one would breed to him with an underbite." There is absolutely no evidence of this at all, as there was never any vet bill or invoice or even a statement to Michael Weinstein that this was an issue or ever occurred. The defamation as to PSYNERGY and Atticus must cease and desist now.

81.    Dr. Elke Pollaris, the veterinarian dental expert at Bosdreef equine hospital in Belgium, after performing an examination on the teeth of Atticus, found and reported on October 10, 2024 the following:

1.    Occlusion: underbite.
2.    Abnormal wear of the incisors.
3.    There is a defect in the secondary dentin of teeth 301 and 401. A Hedstrom file can be inserted. The gingiva attaches well.
4.    Canines present.
5.    Radiography:
        Maxillary incisors: No significant remarks.
        Mandibular incisors: 301: radiograph indicative for the presence of a dentinal bridge in the pulp canal.  401: exposed pulp cavity, the root is rounded, indicative for a apexification.
6.    A dentinal bridge is a response to pulpitis, or inflammation of the pulp, which can be caused by dental fractures or other insults to the endodontic system].  Causation is typically the result of "cribbing," over-grinding, tooth fracture, or biting the bars of a stall or hard surfaces which creates the abnormal wear on the front of the incisors due to friction from rubbing.

**FIRST CAUSE OF ACTION**
**FRAUD & DECEIT**
**(As to all Defendants)**

82.    Plaintiff realleges and incorporates by reference paragraphs 15-81, inclusive, as though fully set forth herein.

83.    This is action at law to recover damages for fraud and misrepresentation.

84.    Based on the promises and assurances by SOCIETA, NOËMIE ZELLER, GIAMPAOLO "WOODY" GUBBIOTTI, PAOLO CAPECCI, SUSANNE GURSCHLER CAPECCI, CAPECCI ARABIAN TRAINING CENTER, and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER, as fully described in paragraphs 19 and 24, and incorporated by reference, that each of them would oversee and be in charge of Atticus and be responsible for caring and maintaining him with the highest standard of care during the entire duration of his stay, these promises and representations were never kept.  Instead, the antithesis occurred and Atticus was subjected to neglect, abuse, and cruelty, which led to him be euthanized.

85.    Prior to each of the Defendants taking custody and control of Atticus, Atticus had no history of cribbing, biting the bars of his stall or other hard surfaces. Therefore, when the veterinary dentist was asked if the abnormal wear on the incisors of Atticus could be as a result of a power float used to "adjust" the bite, her answer was "Yes."  Apexification is used to address pulp necrosis [pulp inside teeth dies, usually due to tooth decay or trauma].  Apexification is indeed seen after pulp necrosis.  When the veterinary dentist was asked if the pulp necrosis seen in incisor 401 could be due to trauma to the teeth by the use of a power float, the answer was "Yes." While not common to have an underbite, given that Arabian show horses are well known for their exceptional beauty and elegance, the breed type, body conformation and movement are assessed during horse shows.  An Arabian horse with misaligned teeth can be penalized in the show ring at the discretion of the judges. As stated above, Atticus' Passport did not conform with EU regulations.  Specifically, the Passport requires, "10) The horse corresponding to this passport must comply with the health requirements of the country of origin and with the health requirements of the destination country."  The only vaccinations received in 2024 were the influenza and tetanus.

Moreover, prior to Atticus' journey to Italy, he never experienced any exposure to E. coli, had never had an incidence of colic, or had any chronic ulcers, and had no history of medical or foot problems.   Regarding Atticus' pneumonia and respiratory issues, he developed, given the widespread endemic in the EU from horse to horse through contact with nasal discharge or spread as aerosol droplets, NOËMIE ZELLER, GIAMPAOLO "WOODY" GUBBIOTTI, and PAOLO CAPECCI, could have prevented the respiratory and abortive form of EHV-1 and EHV-4 safely and successfully without endangering the horse.  The Bosdreef clinical report, prepared by DVM Katleen Vanschandevijl, supports the following findings and conclusion:

- "Shipping fever, development of a septic pleuropneumonia.  Multiple bacteria were isolated and a positive titer for EHV-4 was retrieved.

- "Development of abscessation in both pleural cavities with need for thoracotomy to debride.

- "Gastric ulcers – ESGD: grade 2/4

- "Laminitis and progressive sinking in both front feet, resulting in perforation of the sole.

- "Atticus was euthanized on October 17th based on its clinical presentation (non-weight bearing on his left forelimb). Radiographs showed a significant evolution of the laminitis, pointing towards irreversible structural damage (sinking and rotation in both front feet, and signs of perforation of the sole at the left front foot).

- "Euthanasia was performed to prevent prolonged suffering and ensure ethical treatment. The decision was based on veterinary assessment in alignment with ethical guidelines prioritizing animal welfare."

86.    Atticus was cherished by many admirers, fans, followers, enthusiasts, colleagues, and professionals.  Atticus' death is a shock to the Arabian Horse Industry.  That death never, ever, should have occurred.  But for Defendants' maltreatment of Atticus, he would still be well and alive.  Had Defendants taken even the smallest amount of reasonable care, he would be alive.  Had Defendants had him visited by a veterinarian and given the mandatory vaccines, he would be alive.  Had Defendants notified or given updates to PSYNERGY that Atticus was not feeling well, he would be alive.  Atticus died of a terrible, painful, and tragic death.  Atticus, through his suffering, fought every single day to stay alive, but because of Defendants' intentional violation of Italian

laws, and because the viruses he caught at Defendants' training center, it was too much for his frail body to sustain. His loved ones watched him suffer everyday knowing that this should have never ever happened and then had to say goodbye to him. If Defendants had done what is mandated by law and humanity, instead of their iniquitous treatment, Atticus would not be dead, and his owners would not be suffering having watched the disease ravish and take over his body and then his eventual and inevitable young death. Defendants failed to use "reasonable care" in carrying out these required tasks and inherent responsibilities and the necessary degree/standard of care that a prudent and careful equine breeder, caretaker, and trainer would use in similar circumstances. Defendants fell short of this standard of care, and as a result are legal causation of Atticus's demise and must be legally accountable for the damages that resulted. The death of Atticus would not have occurred but for the malfeasance of the Defendants. The death of Atticus, a National Arabian treasure, has been a shock and disbelief worldwide and especially to the Arabian Horse world. The malfeasance of the Defendants is abundant, as the facts stated herein will clearly show to any reasonable person. Succinctly, from the date of Atticus' arrival at Capecci Training Center in March of 2023 to the date that he arrived at the clinic in Belgium, August 19, 2024, Atticus was never given the vaccine for EHV 1-4, the herpes Rhino Vaccine. Upon arrival at the clinic Bosdreef, Dr. Katleen Vanschandeviji, stated that Atticus was "admitted with fever, small amounts of nasal discharge and a nasal swab. (21/08) returning positive for EHV-1 and EHV-2. Today he is waking stiff in the hind." Therefore, Atticus should not have been shipped with a chronic issue. All the above resulted in a perfect cascade of events of: chronic infection, poor body condition, ulcers, exposure to EHV-4. Moreover, this culminated in a massive pleuropneumonia that Atticus was incapable of fighting effectively.

87.    Atticus, based on his pedigree and bloodline prior to his departure from the USA to Italy, his show record and performance, age and training, conformation and aesthetics, color and markings, health and soundness, market demand, and breeding potential, was conservatively valued more than one million dollars in US currency. Atticus is the recipient of the following accomplishments and achievements:

- 2021 Scottsdale International Silver Champion Senior Stallion

- 2021 Arabian Breeders World Cup Supreme Bronze Champion Senior Stallion

- 2019 Canadian National Reserve Champion Stallion (tied for Champion)

- 2018 U.S. National Reserve Champion Futurity Stallion

- 2018 Arabian Breeders World Cup Supreme Silver Champion Stallion/Colt ATH

88.    The representations made by SOCIETA, NOËMIE ZELLER, GIAMPAOLO "WOODY" GUBBIOTTI, PAOLO CAPECCI, SUSANNE GURSCHLER CAPECCI, CAPECCI ARABIAN TRAINING CENTER, and CA' DI GIANNI INTERNATIONAL ARABIAN TRAINING CENTER, were in fact false.  The true facts were the opposite and were only going to use Atticus for breeding and stud services and profit from the sales and his notoriety.

89.    At the time the representations and promises were made, PSYNERGY did not know or suspect the true intentions of the Defendants because Defendants were international and world renown Arabian horse breeders by profession and reputation.  PSYNERGY learn the truth until after Atticus was released into the custody and control of Defendants and Defendants hid and concealed Atticus' health condition and well-being.

90.    When each of the Defendants made these representations and omissions, they knew them to be false, and these representations were made by Defendants with the intent to defraud, deceive, and entice PSYNERGY to relinquish custody and control of Atticus.  Had PSYNERGY known the true facts, it would not have agreed to the false promises and representations to release custody and control of Atticus.  PSYNERGY reasonably relied on the assurances and promises to its detriment.

91.    PSYNERGY, at the time these representations were made by Defendants, and at the time, PSYNERGY believed the representations, promises, and assurances as herein alleged, was ignorant of the falsity of the Defendants' representations and believed them to be true.  In reliance on these representations, PSYNERGY released custody and control for purposes as fully described in paragraphs 19 and 24.

92.    As a proximate result of the intentional misrepresentation, deceit, or concealment of material facts and omissions known to the Defendants, PSYNERGY was injured by the loss of

Atticus and the associated costs and expenses necessary to medically treat Atticus. As a further proximate result, PSYNERGY will have monetary losses due to the loss of breedings. Specifically, the future loss of income will exceed approximately $2,450,000 USD [minimum 14 years of breedings X $175,000 annually] based on the fact that Atticus' father, El Nabila, is still breeding at 29 years of age. Accordingly, this estimate is very conservative.

93. Furthermore, Defendants have failed and refused to pay PSYNERGY for the successful breedings sold between late March 2023 and August 2024. PSYNERGY believes and understands that it is owed approximately 19'375 Euros [not USD currency].

94. In doing the acts set forth above, Defendants knew that their conduct was despicable and cruel in conscious disregard of PSYNERGY's rights to be free from fraud, deception, and misrepresentations. PSYNERGY's demand thereby warrants the assessment of punitive damages in a sum according to proof. PSYNERGY will seek leave to amend this Complaint to state such amounts at the time they are ascertained, or according to proof at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF WRITTEN CONTRACT**
**(As to all Defendants)**

95. Plaintiff realleges and incorporates by reference paragraphs 15-81, inclusive, as though fully set forth herein.

96. This is action at law to recover damages for breach of written contract.

97. Based on the promises and assurances by Defendants as fully described in paragraphs 19 and 24, PSYNERGY agreed to the terms and did not receive the benefit of the bargain. In fact, PSYNERGY was injured by the loss of Atticus and the associated costs and expenses necessary to medically treat Atticus as described and alleged above. As a further proximate result, PSYNERGY will have monetary losses due to the loss of breedings. Specifically, the future loss of income will exceed approximately $2,450,000 USD [minimum 14 years of breedings X $175,000 annually] based on the fact that Atticus' father, El Nabila, is still breeding at 29 years of age. Accordingly, this estimate is very conservative.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

98.    Notwithstanding the fact that PSYNERGY has performed its part of the bargain and agreement, and Defendants received the benefit of the bargain by profiting as alleged above, Defendants have reneged and breached the agreement by causing the death of Atticus.

**THIRD CAUSE OF ACTION**
**NEGLIGENCE**
**(As to all Defendants)**

99.    Plaintiff realleges and incorporates by reference paragraphs 15-81, inclusive, as though fully set forth herein.

100.    Defendants agreed to accept the duty of care and the legal obligation to ensure the safety and well-being of Atticus as fully described in paragraphs 19 and 24 above, specifically that Defendants agreed ". . . to preserve the good health of the animal by providing daily rations of food, . . as well as the owner and a veterinarian."  That it ". . . undertakes to cover all ordinary expenses of services provided during the stay of the horse (including but not limited to breeding, feeding, farrier (sic), etc.), as well as extraordinary expenses. . ."  Moreover, SUSANNE GURSCHLER CAPECCI added, "However, as reassurance, the Company guarantees that their employees are responsible and capable persons, fit for handing and working with horses."  However, Defendants breached their duty of care which led to the death of Atticus.  Plaintiff's harm ordinarily would not have occurred unless someone was negligent.

101.    The harm occurred while Atticus was under the care and control of the Defendants.

102.    If Defendants had provided the proper use of "reasonable care" in carrying out these required tasks and inherent responsibilities and the necessary degree/standard of care that a prudent and careful equine breeder, caretaker, and trainer would use in similar circumstances the death of Atticus would not have occurred but for the malfeasance of the Defendants.

103.    Plaintiff's actions did not cause or contribute to the events that caused the death of Atticus.

104.    As a direct and proximate result of the negligence stated above, Atticus was injured, died of a terrible, painful, and tragic death.  Moreover, Plaintiff has incurred veterinary medical

expenses and related expenses, which were reasonable and necessary for the treatment and care of Atticus' injuries.

105.    As a direct and proximate result of the neglect and/or lack of care stated above, Plaintiff loss of income from the breedings described above which is currently unknown. Plaintiff will be deprived of being able to pleasure-ride Atticus and enroll him in shows.

**FOURTH CAUSE OF ACTION**
**CONVERSION**
**(Embezzlement / Breach of Fiduciary Duty / Unjust Enrichment)**
**(As to all Defendants)**

106.    Plaintiff realleges and incorporates by reference paragraphs 15-81, inclusive, as though fully set forth herein.

107.    This is an action to for conversion of revenue and profits received from third party investors because Defendants have failed and refused to pay PSYNERGY for the successful breedings sold to investors.

108.    On or about **January 16, 2024**, NOËMIE ZELLER provided Michael Weinstein a final accounting of revenue for Atticus wherein, among other items, NOËMIE ZELLER reported that Atticus brought in a total of 32,000 Euros. NOËMIE ZELLER added that the total amount to be transferred to Michael Weinstein was 19'375 Euros and thanked him for entrusting Atticus with her in Europe. At this time today, November 2024, Michael Weinstein does not have a full accounting of all of Atticus' breedings.

109.    Between late **March 2023 and August 2024**, though Atticus successfully provided numerous breedings for NOËMIE ZELLER's and GIAMPAOLO WOODY GUBBIOTTI's clients which yielded substantial revenue in the thousands of Euros, PYNERGY, has yet to see any share of the profits. NOËMIE ZELLER admitted to Michael Weinstein that she received payments for the breedings and that all of the breedings sold had been fully paid to her and the Capecci training center.

110.    Furthermore, Defendants have failed and refused to pay PSYNERGY for the successful breedings sold between late March 2023 and August 2024. PSYNERGY believes and understands that it is owed approximately 19,375 Euros [not USD currency].

111.    At all relevant times herein, Defendants had and continued to have a legal obligation imposed by the Agreement to pay Plaintiff all earned revenue received from the profits realized from the breedings.  Accordingly, such monies were and are the property of Plaintiff, not Defendants.

112.    Defendants knowingly and intentionally failed to pay Plaintiff its share of the profits in the sum of 19,375 Euros [not USD currency].  Instead, Defendants substantially interfered with Plaintiff's property when Defendants converted Plaintiff's rightfully earned monies for Defendant's own enrichment.  Defendants converted such monies as part of an intentional and deliberate scheme to maximize their profits at Plaintiff's expense.

113.    Plaintiff did not consent to Defendants' taking of its monies and Plaintiff has been injured by Defendants' intentional conversion of such funds.  Defendants' conduct was a substantial factor in causing Plaintiff's harm because Defendants kept, and have not paid Plaintiff's monies.

114.    Plaintiff is entitled to immediate possession of all amounts converted by Defendants, with interest.  Before the filing of this action, Plaintiff wrote a pre-litigation demand to Defendants detailing its claim and demanded that Defendants pay the amounts owed and offered to discuss a pre-litigation resolution of this matter.  Despite this demand, Defendants refuse to pay Plaintiff the monies they owe Plaintiff.

115.    In committing the foregoing acts, Defendants were guilty of oppression, fraud, or malice, and, in addition to the actual damages caused thereby, Plaintiff is entitled to recover punitive damages for the sake of example and by way of punishing Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff PSYNERGY prays for judgment against the Defendants, jointly and severally, as follows:

## AS TO THE FIRST CAUSE OF ACTION:

1. For general damages in a sum according to proof;

2. For special damages in a sum according to proof; and

3. For punitive and exemplary damages in a sum according to proof.

## AS TO THE SECOND CAUSE OF ACTION:

1. For general damages in a sum according to proof.

**AS TO THE THIRD CAUSE OF ACTION:**

    1.   For general damages in a sum according to proof.

**AS TO THE FOURTH CAUSE OF ACTION:**

    1.   For general damages in a sum according to proof;

    2.   For special damages in a sum according to proof; and

    3.   For punitive and exemplary damages in a sum according to proof.

**AS TO ALL CAUSES OF ACTION:**

    1.   For cost of suit herein incurred

    2.   For such other and further relief as the Court may deem just and proper; and

    3.   Plaintiff hereby demand a jury trial on all issues and causes of action in the above entitled action.

DATED: February 24, 2025          **LAW OFFICES OF JOSEPH L. ALIOTO AND ANGELA ALIOTO**

_____
Angela M. Alioto, Esq.
Steven L. Robinson, Esq.
Angela Mia Veronese, Esq.
Attorneys for Plaintiff,
PSYNERGY